

# THE ATTORNEY GENERAL
# OF TEXAS

GROVER SELLERS

AUSTIN 11, TEXAS

XXXXXXXXXXXXXXXXXXXXXX
ATTORNEY GENERAL

Honorable Gibb Gilcrest, President
Agricultural and Mechanical College of Texas
College Station, Texas

Dear Sir:              Opinion No. O-6230
                       Re: Questions as to the effect, meaning,
                           and application of certain provisions
                           of a contract between the United
                           States of America and Agricultural
                           and Mechanical College of Texas.

          On September 19, 1944, you adressed to this office
a letter requesting the opinion of the Attorney General upon
four questions contained in such letter.  These questions,
you explained, had arisen out of a difference of opinion be-
tween certain representatives of the Bureau of Naval Person-
nel purporting to act on behalf of the United States Govern-
ment and the Agricultural and Mechanical College of Texas as
to the meaning and effect of contract Number d-3102 and sup-
plements thereto, and more particularly as to the effect,
legality, and validity of certain articles and sections of
said contract and its supplements.

          You attached to your letter a copy of the contract
in question, together with exhibits containing: resolutions
and schedules authorizing the issue of bonds for construction
of a laundry and expansion of power plants at the college;
copies and extracts from correspondence between certain per-
sonnel of the Navy Department and of the college relating to
the contract; principals of contract promulgated by the Bu-
reau of Naval Personnel; and summaries of costs covering the
period from December 1, 1942, through March 31, 1944, part
of which costs, accounting or finance officers of the Naval
Department had advised the college should not be allowed.

          We thank you for providing this complete file,
since it has aided us very materially in the consideration
of the questions submitted.

          Here set out is the penultimate paragraph of your
letter, followed by your questions:

          "In our opinion the College is entitled to
all of the items disallowed by the Navy Depart-

ment. Inasmuch as the Navy Department requests a prompt adjustment based on the amounts disallowed and has discontinued payments under the contract as of June 30, 1944, we would like to have your advise as to how to proceed and submit the following questions:

"1. Is this contract subject to renegotiation?

"2. Is the College entitled to charge the rates for laundry service and electricity established by the resolutions authorizing the issuance of revenue bonds for the construction of the laundry and the expansion of the power plant?

"3. Is the College entitled to the 92.5 cents per man per day for subsistence as provided for in Article 4 of the contract or are these payments subject to adjustment on the basis of actual cost?

"4. Is it possible for the College to execute Supplement No. 5 to the contract (a copy of which is included in Exhibit A) without waiving its right to file a claim for the amounts disallowed, by signing the supplement under protest or with reservations?

"If so, will you please favor us with the wording to insert in the supplement."

These questions are hereinafter restated and answered categorically. Each one is followed by such explanation and discussion as is deemed necessary in order to show the reasons leading to the conclusions stated.

Question No. 1:

"Is this contract subject to renegotiation?"

part of the Texas Legislature occurred after the Congress of
the United States by an Act passed July 2, 1862, donated one
hundred and eighty thousand acres of land to each State for
the purpose of building an agricultural and mechanical col-
lege, and in its Act establishing the Agricultural and Me-
chanical College of Texas, the Texas Legislature accepted
the offer thus made by the United States Congress.  Section
5 of this Act creating the College, provided that the con-
trol, management and supervision of the Agricultural and Me-
chanical College of Texas and the care and preservation of
its property, should be subject to the laws creating and
governing the University of Texas.  That law (Chapter 116,
General Laws of the 7th Legislature of Texas, 1858) in Sec-
tion 3 thereof provided that such control, management, etc.,
subject always to the control of the Legislature, should be
committed to an administrative board created by the last
named Act.

Article 3, Section 48, of the Constitution of Texas,
confers upon the State Legislature the right to levy taxes
for the maintenance and support of the AGricultural and Me-
chanical College of Texas.

Article 7, Section 13, of the Constitution of Texas,
makes and constitutes the Agricultural and Mechanical College
of Texas a branch of the University of Texas.

Article 7, Section 16, of the Constitution of Texas,
empowers the Legislature to fix the terms of all officers of
the State Institutions of Higher Education and the terms of
the members of the Boards of such institutions.

The Agricultural and Mechanical College of Texas is
supported by direct, detailed, biennial appropriations of the
Texas Legislature, (see the Appropriation Acts of the Regu-
lar Session, 48th Legislature, and of preceding sessions) from
state moneys provided by taxation.  It is and has been since
its establishment a creation of the State, directed and con-
trolled by the Legislature.

The Agricultural and Mechanical College of Texas,
the contractor, is an arm, an instrumentality of the State
of Texas.  It is an agency of the State under any reasonable
interpretation or understanding of that term.

Codified under Title 50, App. Sec. 1191, United
States Code Annotated, is United States Congressional Act of
April 28, 1942, C. 427, Title IV, Section 403, 56 Stat. 245,
as amended, the most recent amendment being that of February
25, 1944, C. 63, Title VII, Section 701 (b), 58 Stat. 78.

This is the A$_c$t popularly known as the "Renegotiation Act,"
and contains this provision, quoted in part as follows:

"(1)  Contracts exempted; Board's interpre-
tation and application of exemptions

"(1)  The provisions of this section
shall not apply to --

"(A)  any contract by a Department
with any other department, bureau, a-
gency, or governmental corporation of
the United States or with any Territory,
possession, or State or any agency there-
of or with any foreign government or any
agency thereof; or

" . . . . .

"(2)  The Board is authorized by regu-
lation to interpret and apply the exemptions
provided for in paragraph (1)  (A), . . ."

The "Board" mentioned in the above quoted subsection
of the Act is an agency created by the said Act as last amend-
ed.  Its full title is "War Contract Price Adjustment Board"
and it is made up of duly appointed personnel one each from
the War Department, Navy Department, Treasury Department,
United States Maritime Commission, or the War Shipping Admin-
istration, Reconstruction Finance Corporation, and the War
Production Board.

Acting under the provisions of the Act as set out
hereinabove, the War Contract Price Adjustment Board published
at page 6165 of the Federal Register for Wednesday, June 7,
1944, over the Seal of said Board, and the signature of James
S. Freight, Lieutenant, U.S.N.R., Secretary of said Board,
certain renegotiation regulations dated June 7, 1944, which
contained its interpretations quoted in part as follows:

"◊ 1603.341.  The mandatory exemptions.
(1) Contracts and subcontracts with other Govern-
mental agencies are exempted by subsection (i)
(1) (A). (See ◊ 1603.343.)

" . . . .

"◊ 1603.343  Contracts and subcontracts with
other governmental agencies -- (a) Statutory ex-
emption.  Subsection (i) (1) (A) of the 1943 act

provides that it shall not apply to:

"(A)  any contract by a Department with
any other department, bureau, agency, or
governmental corporation of the United States
or with any Territory, possession, or State,
or any agency thereof or with any foreign
government or any agency thereof;

"(b)  Interpretation and application of ex-
emption.  The War Contracts Board has adopted the
following interpretation:

"(1)  Under this provision of the act no
contract between one of the Departments and any
other federal, local or foreign government agency
is subject to rengotiation.  A municipal corpor-
ation, whether acting in a proprietary or gov-
ernmental capacity, is considered to be an agency
of a State for the purpose of this exemption.

"  .  .  .  ."

The exemption provided by the Act is a mandatory
exemption and as shown here, in the quoted portion of the
Board's regulations, it is so recognized by the Board.  It
may be pointed out also that the reference contained in
paragraph (e) of Article L, RENEGOTIATION, of the "general
provis'ons" section of the contract is a reference to this
self same Act containing said mandatory exemption.

Under the plain provision of the Act hereinabove
quoted as under the interpretation and application placed
upon such provision of the law by the War Contract Price Ad-
justment Board, this contract with the Agricultural and Me-
chanical College of Texas, an agency of the State of Texas,
is clearly not subject to renegotiation.

Question No. 2:

"Is the College entitled to charge the rates
for laundry service and electricity established by
the resolutions authorizing the issuance of revenue
bonds for the construction of the laundry and the
expansion of the power plant?"

We answer this question, "Yes," but not necessarily
as cost items.

Our answer would be different were we able to find

within the contract an agreement that the contractor would furnish these services at cost. We do not think the contract evidences any such agreement.

In Article 3, INSTRUCTION, Subsection (c), the contractor agrees to provide light, heat, water power, janitor services and other services and the Government agrees to pay the contractor the sum of $2,500.00 per month, a flat fee for such services. This article contains no agreement that the services therein provided for will be furnished at cost or upon any other basis than the flat fee therein stated.

By the terms of Article 5, QUARTERS, Subsection (a), the contractor will provide light, heat, water and other services. Subsection (b) of this article promises that the Government will pay to the contractor a flat fee of $7,500.00 per month for services rendered under this article which "shall include use of sheets, pillow cases and towels and laundry services therefor."

We find in this article no covenant nor agreement that the services provided will be rendered at cost or upon any other basis than the flat fee therein set out and agreed to. Nor do we find in any other part of the contract any agreement providing that the flat fee contained in the various articles of the contract shall be reduced to actual cost. Article 6 of the contract provides for revision of rates and relates to Articles 3 and 5 in the same manner as to Article 4, with which your next question is concerned. Our view as to the intent and effect of Article 6 will be discussed in connection with the answer to the next following question.

The question as to whether the rates charged by the College as costs and disallowed as such by the Finance Officers of the Naval Department are actually items of cost or of profit, is a problem about which even accountants might disagree. It would seem that under the College's covenant with its bond holders the rates set out in the bond resolution would ordinarily be items of cost since as here used, "cost" means the cost of producing the electricity and the laundry service plus the cost of servicing the bonds. However, the bond resolution and the covenants contained therein, require the charging of such rates only to the extent necessary to acquire and preserve intact the capital or reserve account. So long as such reserve fund is fully maintained, the rates to be charged, we think, may properly be determined by the will and judgment of the College.

If the cost as determined and allowed by the Naval Accountants is correct, that fact does not adversely affect

the right of the contractor to demand payment of the rates charged as an item of profit to which it is entitled under the terms of the contract so long as the resultant total demand for services rendered under these articles of the contract does not exceed the fee which the government promised, in the contract, or by voluntary modification thereof, to pay for such services.

Question No. 3:

"Is the College entitled to the 92.5 cents per man per day for subsistance as provided for in Article 4 of the Contract or are these payments subject to adjustment on the basis of actual cost?"

The answer to this question is, "Yes." In our opinion the contractor is entitled to demand and collect the amount set out and agreed to and promised to be paid by the terms of the contract.

Here set out in full is Article 4 of this contract:

"ARTICLE 4.  SUBSISTENCE

"(a)    The Contractor will prepare and serve three meals per day to the Navy trainees and enlisted personnel at the Training School, but not to exceed 1700 persons at any one time (or such larger number as the Contractor may consent to serve). The hours during which meals are served shall be as specified by the Commanding Officer of the Training School, and the quality, quantity and type of food and the purchase, preparation and serving of all food shall comply with Navy standards.

"(b)    The Government will pay the Contractor compensation for subsistence at the rate of $0.925 per man per day, beginning with December 1, 1942 for the number of men reported by the Commanding Officer to the contractor to be an rations."

Obviously no agreement or covenant for the payment for these services on the basis of cost is contained in this article. Nowhere in the contract have we been able to find any agreement or provision limiting the compensation or reimbursement of the contractor to cost only or in any way or manner prohibiting such contractor from earning, demanding and collecting a profit for furnishing the services, materials

and facilities contracted for, except in Article 1 (f), which deals with commissioning expenses. The agreement in this article is that the Government will pay the contractor an amount equal to the reasonable cost and expenses incurred by the contractor directly in connection with the acquisition, construction, installation and completion of the items listed in Schedule 2 and this agreement is limited to Article 1 -- that is, the commissioning expense.

Article 6 of the contract is an agreement that the rates of payment provided in Articles 3, 4 and 5, may be revised from time to time, and contains the procedure according to which such revision is to be made. The revision contemplated and expressed in this article is a revision of rates to be arrived at by agreement between the parties to the contract, or in case of failure to agree, by appeal to the Secretary of the Navy. The purpose of such revision, we think, is clearly indicated in the article to be that of protecting either or both contracting parties as to future commitments or future operations under this contract. These rate revisions when made are intended to take effect prospectively from their effective dates. It is not intended that the revised rates be used in calculating the amounts already earned and due at the time when such revised rates become effective, and it is not the intention of the parties as expressed in this provision of the contract that the effective date of the revised rates be itself made retroactive. This view is strengthened if strength be needed by the language of an Act of Congress of February 25, 1944, C. 63, Title VIII, Section 801, 58 Stat. 92, codified as Title 50, App. Sec. 1192, U.S.C.A. Subsection (b) of said Act is quoted as follows:

"When the Secretary of a Department deems that the price of any article or service of any kind, which is required by his Department or directly or indirectly required, furnished, or offered in connection with, or as a part of, the performance or procurement of any contract with his Department or of any subcontract thereunder, is unreasonable or unfair, the Secretary may require the person furnishing or offering to furnish such article or service to negotiate to fix a fair and reasonable price therefor. If such person refuses to agree to a price for such article or service which the Secretary considers fair and reasonable, the Secretary by order may fix the price payable to such person for furnishing such article or service after the effective date of the order, whether under existing agreements or otherwise. The order may prescribe the period during which the price so

fixed shall be effective and such other terms and conditions as the Secretary deems appropriate." (Emphasis ours)

The Act of which the above is a portion was passed and became effective long after the contract here under discussion was executed and only some thirty-five days before the termination of the contract period with which this opinion is concerned. It therefore has no direct relation to or efcect upon this contract. It is, however, considered of some persuasive value as tending to show the Congressional view point or intention toward the revision or fixing of rates and prices.

An attempted application of Article 6 in such manner as to deny the view as to its intention here expressed and to give a retroactive effect to the revision of rates or to apply such rates retroactively would be to ignore or to seek to circumvent the will of Congress as clearly expressed in Subsection (i) of Title 50, App. Section 1191, U.S.C.A. Such retroactive application would in effect be renegotiation; and as pointed out in our discussion of question No. 1 hereof Congress has in the Act and subsection last cited mandatorily exempted the class of contractors to which Agricultural and Mechanical College of Texas belongs from renegotiation.

Question No. 4:

"Is it possible for the College to execute Supplement No. 5 to the contract (a copy of which is included in Exhibit A) without waiving its right to file a claim for the amounts disallowed, by signing the supplement under protest or with reservations?"

Our answer to this question is, "No."

Essentially and fundamentally, a contract is an agreement. An agreement does not come into being until both or all the parties to the proposed agreement each, and all together, consent to each and all the items or terms contained in such proposal, or until all have agreed and consented to strike or eliminate from such proposal those items or terms to which they cannot all give their assent. This is perhaps over simplification, but we do not believe it is possible for the College to preserve its legal rights, or the privilege of having any controversy regarding those rights properly passed upon, by signing a contract to all the terms of which it cannot agree and at the same time protesting it.

It seems fair to assume from your letter and the file accompanying it that as to some of the provisions of the proposed new contract (Supplement No. 5) the College (contractor) and the department could without controversy agree. If this is possible, the supplement can be re-written incorporating the agreed items and terms only, then both parties can execute it without either party waiving anything. Operations under such agreement could then be carried on pending agreement and settlement of the questions as to which further discussion is required.

As a general commentary in connection with all your questions and in the consideration of the contract as a whole, it should be remembered that when it becomes necessary to legally construe a contract, a cardinal principal to be employed in such construction is that when doubt has arisen, such doubt is to be resolved most strictly against whichever of the parties has drawn the contract, and liberally in favor of the other party or parties to such contract.

We trust that the answers to your questions herein contained and these discussions may be helpful to you.

Yours very truly

ATTORNEY GENERAL OF TEXAS


By s/Robert F. Cherry
Robert F. Cherry
Assistant

RFC:db:wc


APPROVED OCT 4, 1944
s/Carlos C. Ashley
FIRST ASSISTANT
ATTORNEY GENERAL

Approved Opinion Committee By s/GWB Chairman